UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


MICHAEL NICHOLS

     Plaintiff

v.                                    Civil Action No.: 2:04-0434

STEELCASE, INC.

     Defendant
_____
STEELCASE, INC.

     Third-Party Plaintiff

v.

SUSPA, INC.

     Third-Party Defendant


<u>MEMORANDUM ORDER AND OPINION</u>


     Pending before the court is the motion of defendant Steelcase, Inc. ("Steelcase"), filed March 30, 2005, seeking summary judgment on the claims of plaintiff Michael Nichols or, in the alternative, seeking dismissal of those claims for spoliation of evidence.


I.


     This products liability action arises from an incident that occurred on September 20, 2002, at the United States Postal

Service's Remote Encoding Center located at 1002 Lee Street,
East, in Charleston, West Virginia.

A.   The Incident.

At the time of the incident, plaintiff Michael Nichols
was employed by the United States Postal Service ("Postal
Service").  His normal shift was from 3:00 p.m. to 11:30 p.m.
five days a week.  Pl.'s Dep. at p. 11.  His principal job
responsibility was routing mail via computer – a process referred
to as keying mail.  His duties were performed primarily while
seated.  Id. at pp. 10 & 13–14.  On a typical day, there were
approximately 125 employees working his shift.  Id. at p. 14.
There were also three shifts per day.  As to his work
environment, plaintiff testified:

> Q.  Did you each kind of have your own station, so to
> speak?
>
> A.  No.
>
> Q.  Explain to me what the set up was.
>
> A.  The zone I worked for key mailed for several
> different plants.  So each station was assigned to a
> plant and if one plant would have more mail than
> another, they would tell us to move to that certain
> plant.  So we would just bounce around to whichever
> facilities had the mail.

Id. at p. 15.

2

On the day in question, plaintiff was keying mail at one plant when his supervisor requested that plaintiff log off the system and proceed to another plant.  Id. at p. 16.  When plaintiff arrived at that plant, he sat down in the nearest chair and that chair immediately collapsed to its lowest position.  Id. at pp. 16–17.  A co-worker, Lolita Green, witnessed the accident and testified that the plaintiff's chair went down suddenly. Dep. Green at p. 14.  Plaintiff did not know whether he had ever sat in that chair prior to the incident.  Pl.'s Dep. at p. 17. The accident occurred around 5:30 p.m.

Although plaintiff experienced pain in his lower back immediately after the incident, he continued to work.  However, the pain in his back caused him to leave his shift early at 11:00 p.m.  Id. at p. 18.  Two days later, he sought treatment at Charleston Area Medical Center.  Id. at p. 20.  Plaintiff has been unable to return to work.

B.   Examination and Storage.

Plaintiff testified that he did not know what the Postal Service did with the chair after the incident.  He has not seen the chair since the incident.  Id. at p. 21.

Mark Lockhart, a supervisor to whom plaintiff initially

3

reported his injury and a witness to the incident, testified as follows:

> Q.  Was there a time when you became aware of an incident involving Mr. Nichols and a chair here at the post office?
>
> A.  Yes.
>
> Q.  Did you actually witness this incident?
>
> A.  Yes.
>
> Q.  Would you just tell us what you observed?
>
> A.  Well, near as I can recall, he sat down in the chair and the chair slowly went down to its lowest level.
>
> However, I don't know how much that is from the floor, but after, I don't know, a few minutes, I heard him say that he said "[t]hat hurt.

Dep. Lockhart at pp. 7-8.  Lockhart reported the incident to Gail Fernatt, another supervisor, and immediately pulled the chair off the floor.  Dep. Lockhart at p. 13.  A sign was placed on the chair indicating it had malfunctioned.  Id.  He stated that the chair was placed in the IPU room.  Id. at pp. 13 & 15.  He also testified that the chair remained in that room "for months, but – maybe even years."  Id. at p. 15.

An internal accident report was generated by the Postal Service and signed by Kenneth Scott Landers and Fernatt on September 20, 2002.  The report states that:

**4**

Mike Nichols was moved from Flat operation #2 to Flat
operation #3, as he went to sit down, he claims the
chair suddenly dropped causing his back to be shoved
upward.

SUPSA's Mem. Supp. S.J. at Ex. C.  The report further states that

the chair plaintiff was sitting in was "made by Steelcase Inc.

Grand Rapids MI 49501 7/16/96 Model # 4535500."  Id.  The report

notes that "[f]aulty chairs will be discarded to prevent similar

accident from occurring."  Id.  The report further notes that

plaintiff was diagnosed by William Payne with lumbar strain on

September 22, 2002.

Fernatt, who was part of the investigation generating

the report[1], testified as follows:

Q.  Okay.  Do you recall what you did when you went to
retrieve the chair in the corridor on September 20th,
2002?

A.  What was told to me was that the chair crashed to
its base upon Mike Nichols sitting in it.

Q.  Now, who told you that?

---

[1]In the report, Fernatt makes the following statement:

I investigated the accident checked out the chair that
Mr. Nichols said dropped suddenly to a lower level.
While the hydraulic system isn't holding the chair in
the up position it goes down slowly.  I tried several
times to make the chair drop suddenly.  It would go
down slowly.

SUSPA Mem. Supp. Mot. S.J. at Ex. C.

5

A.  Mike Nichols stated that.

Q.  Okay.  So he told you that.  So what did you do?

A.  I tested the chair to see if the chair crashed to its base, as he stated, and the chair slowly went down. It didn't crash.

Dep. Fernatt at pp 24-25.  Although she conducted the testing in front of another employee, Fernatt did not conduct this testing in the presence of plaintiff.  She further testified that:

Q.  How many times did you attempt to get the chair to go down rapidly?

A.  Several.  I tried different ways.  I even tried with my knees, you know, on the chair, and the chair would only sink slowly.

Q.  Did you sit in the chair and do any wiggling?

A.  Yes, I did.

Q.  Side - side to side movements?

A.  Yes, I did.  I dropped myself - I dropped myself like over the chair, and I would drop myself down on it to see if it would sink fast, and it would only sink slowly.

Id. at p. 27.  She indicated that once she removed herself from the fully depressed chair, the chair was able to right itself.[2]

_____

[2]Landers testified that he also examined the chair by sitting in it.  Dep. Landers at p. 29.  He stated that the chair "just went straight down, you know.  It just — and my, you know, I just, I mean, it didn't go down fast.  It went down slow.  So I thought maybe it was leaking or something.  I don't know.  I don't know how they work, but."  Id. at p. 31.  He further stated that the chair sunk to the bottom in a couple of seconds.  Id.

Subsequent to her testing, Fernatt indicated that she placed a tag on the chair that said "'[d]o not touch, this chair was – is kept for an accident investigation'" and she placed the tagged chair in a storage closet.  Id. at p. 29.  At some point, she placed a large trash bag over the chair.  Id.  The last time she saw the chair was during a remodeling, the date of which she does not remember.  Id. at p. 30.  She attempted to track down the chair and was informed that it was placed "upstairs" in the storage room.  Id.  However, she was unable to locate the chair. Id. at pp. 30–31.

Mike Thompson, manager of the remote encoding center, testified that absent advice from the legal department he could not take postal property and give, sell or provide it to an individual.  Dep. Thompson at p. 36.  In fact, he stated that there were specific prohibitions against such action.  Id.

C.   The Chair.

The particular chair involved in the incident was a burgundy Steelcase Criterion pneumatic chair, Model 453-5500.[3]

_____

[3]Of the chair, Steelcase's expert, Erick H. Knox, Ph.d., stated:

According to the available records and testimony, the subject chair was a Steelcase Series 453 Criterion task

7

The model in question was one of approximately 500 such chairs at the facility.  The chair had a base and a back but no arm rests. The chair also enabled the user to pivot 360 degrees as well as to adjust the height of the chair by application of a small lever on its side.

That lever activates a gas spring which connects the base of the chair with the frame.  The gas spring incorporated in the model is manufactured by SUSPA and has been supplied by SUSPA to Steelcase for many years.  Steven D. Jones, SUSPA's General Manager of the Lift System Components Group and a Registered Professional Engineer in the State of Michigan, described the gas spring as follows:

> The gas spring is the device that is located between and connects the base of the chair with the actual chair frame.  The rod of the gas spring points downward and is supported by a thrust bearing.  When the lever on the side of the chair is activated, it opens a valve inside the gas spring which allows gas to flow from one interior chamber to another, causing the rod to move in or out of the gas springs and the chair frame to move up or down (depending on whether there is sufficient

---

chair, model number 453-5500.  The chair was apparently manufactured on 7/16/96 and had been in service for over 6 years.  This is an armless ergonomically adjustable chair.  The height is adjustable through a manual lever just underneath the seat cushion that activates a pneumatic cylinder within the pedestal. The range of heights is approximately 16 to 21 inches.

Steelcase's Reply at Ex. A, p. 4.

8

weight in the chair).  If the gas spring is operating
properly, a gas-tight seal is formed between the two
chambers by the piston and a rubber O-ring that fits
around the piston.

A thrust bearing is the interface between the gas
spring and the chair base.

Suspa Resp.'s to Steelcase's Mot. S.J. at Ex. F (Jones Aff.),

¶ 6.


     Carlon Snyder, Steelcase Product Safety Manager,

acknowledged that Steelcase has received customer complaints

related to the failure of the "pneumatic cylinder."[4]

Specifically, he testified that:

Q.  Yes.  Have they come up with any solution or
reasoning as to why the customers are raising the
complaints that they've raised via the lawsuits and
various – have they said, yes, we've checked our
cylinder and it's too long, too short, air escapes,
we've got to fix this, got to fix that?

A.  The most significant issue that we have found to be
the root cause of these problems has been wear out of
the pneumatic cylinder.  More specifically, the o-ring
internal to the cylinder.

Dep. Snyder at p. 30.  He noted that usage would wear the

internal O-ring out but that the chair is not sold with any

written life expectancy.  Id.

_____

     [4]It appears that the pneumatic cylinder refers to the gas
spring or some portion of the chair including the gas spring.
For purposes of consistency, the court will adopt SUSPA's
terminology of gas spring.

Plaintiff retained Gary L. Jackson, a Professional Engineer licensed in Texas and Louisiana, as an expert.  He examined two exemplars of similar model chairs which were removed from service at the Charleston facility for purportedly similar problems.  Only one of the chairs, however, exhibited the same type of failure as described by plaintiff in that "[w]hen activated the seat sinks to its lowest position unattenuated at a rapid pace with a jarring impact as it reaches the bottom."[5] Pl.'s Resp. at Ex. F.  According to Jackson, further testing revealed that the descent rate varied "upon the orientation of the piston rod and base to the cylinder."  Id.  His examination of the cylinder revealed that the O-ring which seals the piston rod to the end of the cylinder is no longer intact, allowing air "to enter the exterior enclose[d] cavity of the cylinder without depressing the release button on the base of the cylinder."  Id. The chair is thus prevented from locking at a particular height. He concluded, based on his testing of one, that the chair

---

[5]Knox counters the findings of Jackson with respect to the speed of the descent and the impact upon reaching the lowest level.  He opines that plaintiff apparently sat down in a chair that had a worn out gas spring resulting in a descent that would not have produced significant force on his back.  He also opines that "[g]iven the heavy use environment of Mr. Nichols and the 6 year service life of the chair, it is more likely than not that the cylinder was worn through normal anticipated use of the chair, and not the result of a defective design." Steelcase's Reply to Pl.'s Resp. at Ex. A.

10

involved in the plaintiff's incident likely contained a defective and failed gas spring.  Id.  During his deposition, he acknowledged that, due to the lack of the chair, he could not render any opinions as to the cause of the failure for the incident chair.  Dep. Jackson at p. 88.

SUSPA's Jones notes that the failure of the thrust bearing, which allows the gas spring and attached chair frame to swivel, results in damage to the piston, the O-ring and the inner wall of the gas spring inasmuch as the failure of the thrust bearing does not allow the gas spring to swivel as intended. Aff. Jones at ¶ 7.  The failure of the thrust bearing causes "the piston and O-ring to rotate within the chamber rather than moving up and down along the inside of the chamber wall as designed." Id.  The O-ring may even under certain circumstances become twisted.  Id.  A damaged or twisted O-ring will result in the loss of the "gas-tight seal," allowing the chair to descend faster than designed.  Jones states that "[t]here are many reasons for a thrust bearing to cease to operate as intended, which include the following: improper design, improper manufacture, improper lubrication, improper application, contamination, side-loading and corrosion."  Id. at ¶ 8.

Jones asserts that during 1992-98, Steelcase used

plastic thrust bearings in their chairs instead of steel ball
thrust bearings.  Id. at ¶ 12.  He contends that the steel ball
bearings were more appropriate for maintaining the swivel action
of the chair but that the plastic thrust bearings are less
expensive.  Id. at ¶¶ 10-11.  He states that SUSPA advised
Steelcase that a plastic thrust bearing might not be appropriate
for this application, suggesting that the failure of the plastic
thrust bearings could be the reason for the malfunction.  Id. at
¶¶ 8 & 13.  He notes that the two exemplars contained plastic
thrust bearings.  Id. at ¶ 14.

        In addition to the issue concerning the thrust
bearings, Jones also notes that there are other potential causes
for the malfunction attributable to Steelcase including a
defective activation mechanism.  Specifically, he states the
following:

> If the activation mechanism is adjusted incorrectly,
> the result is excessive pre-loading against the
> cylinder activation pin, causing the chair to sink
> without a person utilizing the activation mechanism.
>
> Furthermore, the activation mechanism has malfunctioned
> in the past when a screw or some other component of the
> chair has come loose and caused the chair to sink
> without a person utilizing the activation mechanism.

Id. at ¶¶ 16-17.

        Snyder testified that Steelcase worked with SUSPA for

12

the change in thrust bearings from steel to plastic.  <u>Id.</u> at

p. 51.  He further testified as follows:

> Q.  Do you know whether the plastic ball thrust
> bearings can affect the O-ring differently than the
> steel ball thrust bearings?
>
> A.  I don't know that they do.  I don't have firsthand
> knowledge that they do, but from an engineering
> prospective, I can envision where, under certain
> circumstances, that could be a possibility, yes.
>
> Q.  The possibility that you envision, can you explain
> how the affects could be different?
>
> A.  Well, the extreme case, if those bearings were not
> lubricated at all, steel thrust bearings or the plastic
> thrust bearings, I would expect that you would see –
> potentially see higher wear rates on the O-ring.  And
> that would – in my estimation, that would be the most
> significant cause of difference between a plastic
> thrust bearing or a steel ball bearing – thrust
> bearing.
>
> Q.  Is it Steelcase that provides the lubrications for
> the thrust bearings?
>
> A.  Yes.  We lubricate those at final assembly.

<u>Id.</u> at pp. 52–53.  Jackson, Jones, Knox and Snyder all note that,

without the actual chair, it is impossible to pinpoint the

precise defect.

    D.  <u>The Complaint.</u>

        On March 23, 2004, Nichols filed a two-count complaint

against Steelcase in the Circuit Court of Kanawha County.  Count

I of his complaint contends that Steelcase sold the chair in a

defective condition and should be held strictly liable for any injuries incurred.  Count II of his complaint asserts that Steelcase failed to adequately warn the plaintiff that the chair may not be reasonably fit for its intended use.

Steelcase has moved for summary judgment.  Steelcase notes that inasmuch as the chair is not available plaintiff may only attempt to prove strict liability through circumstantial evidence as set forth in Syllabus Point 3 of <u>Anderson v.</u> <u>Chrysler</u>, 403 S.E.2d 189 (W. Va. 1991).  Because there is no evidence to show that the chair was used properly during its lifetime and no evidence excluding any reasonable secondary causes as the reason for the malfunction, Steelcase contends that summary judgment is warranted.  Steelcase further contends that the action should be dismissed because plaintiff was under a duty either to retain the chair or notify Steelcase of its right to inspect the chair.  Inasmuch as plaintiff breached such duty, Steelcase asserts that its defense of this action has been severely prejudiced.

Plaintiff opposes the motion, contending that the circumstantial evidence establishes a malfunction that would not ordinarily have happened in the absence of a defect.  He states that his expert establishes that the malfunction may have been

14

related to the failure of an O-ring in the gas spring.  He notes
that the defect identified by his expert was one for which
Steelcase has received previous customer complaints.
Additionally, plaintiff argues that spoliation should not be
found here because he has not been shown to have some degree of
fault in the disposal or misplacement of the subject chair.

II.

A party is entitled to summary judgment "if the
pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any, show
that there is no genuine issue as to any material fact and that
the moving party is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(c).  Material facts are those necessary to
establish the elements of a party's cause of action.  Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A genuine issue
of material fact exists if, in viewing the record and all
reasonable inferences drawn therefrom in a light most favorable
to the non-moving party, a reasonable fact-finder could return a
verdict for the non-movant.  Id.  The moving party has the burden
of showing -- "that is, pointing out to the district court --
that there is an absence of evidence to support the nonmoving
party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 325

15

(1986).  If the movant satisfies this burden, then the non-movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial.  Fed. R. Civ. P. 56(c); Celotex Corp., 477 U.S. at 322-23.  A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-moving party.  Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

Conversely, summary judgment is not appropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party.  Anderson, 477 U.S. at 248.  Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute.  Overstreet v. Kentucky Cent. Life Ins. Co., 950 F.2d 931, 937 (4th Cir. 1991).

In reviewing the evidence, a court must neither resolve disputed facts or weigh the evidence, Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility.  Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir. 1986).  Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor.

16

_Charbonnages de France v. Smith_, 597 F.2d 406, 414 (4th Cir.
1979).  Inferences that are "drawn from the underlying facts ...
must be viewed in the light most favorable to the party opposing
the motion."  _United States v. Diebold, Inc._, 369 U.S. 654, 655
(1962).

III.

    A.  _Strict Liability._

    Under West Virginia law, a manufacturer may be held
strictly liable if it places a product that has a design or
structural defect into the stream of commerce and that defect is
the proximate cause of an injury.  _Morningstar v. Black & Decker
Mfg. Co._, 253 S.E.2d 666, 682 (W. Va. 1979).  The purpose of
imposing strict liability is "to relieve the plaintiff from
proving that the manufacturer was negligent in some particular
fashion during the manufacturing process and to permit proof of
the defective condition of the product as the principal basis of
liability."  _Id._ at Syl. Pt. 3.  Three broad and not mutually
exclusive categories of strict liability claims have been
recognized in West Virginia and those categories are as follows:
"design defectiveness; structural defectiveness; and use
defectiveness arising out of the lack of, or the inadequacy of

17

warnings, instructions and labels." <u>Id.</u> at 682.

The general test for a design or structural claim "is whether the involved product is defective in the sense that it is not reasonably safe for its intended use." <u>Id.</u> at Syl. Pt. 4. The inquiry of whether a product is reasonably safe focuses on the standards employed by a reasonably prudent manufacturer and not the standards of the particular manufacturer. <u>Id.</u> Unlike product defectiveness, "use defectiveness covers situations when a product may be safe as designed and manufactured, but which becomes defective because of the failure to warn of dangers which may be present when the product is used in a particular manner." Syl. Pt. 2, <u>Ilosky v. Michelin Tire Corp.</u>, 307 S.E.2d 603 (W. Va. 1983). However, "[f]or the duty to warn to exist the use of the product must be foreseeable to the manufacturer or seller." <u>Id.</u> at Syl. Pt. 3.

In <u>Anderson v. Chrysler Corp.</u>, the West Virginia Supreme Court of Appeals addressed the issue of whether a strict liability claim may be proven by circumstantial evidence. The court answered in the affirmative, holding that:

> Circumstantial evidence may be sufficient to make a <u>prima facie</u> case in a strict liability action, even though the precise nature of the defect cannot be identified, so long as the evidence shows that a malfunction in the product occurred that would not

18

> ordinarily happen in the absence of a defect.
> Moreover, the plaintiff must show there was neither
> abnormal use of the product nor a reasonable secondary
> cause for the malfunction.

Id. at Syl. Pt. 3.  The plaintiff bears the burden of proffering

the circumstantial evidence required by Anderson.  Beatty v. Ford

Motor Co., 574 S.E.2d 803, 807 (W. Va. 2002).  In Bennett v. ASCO

Services, Inc., __ S.E.2d __ 2005 WL 1604028 (W. Va. July 8,

2005), the court clarified the proof needed at the summary

judgment stage, stating that:

> Anderson does not require a plaintiff, to succeed at
> the summary judgment stage, to conclusively eliminate
> all possible contributing causes other than a defect
> for an accident.  Instead, a plaintiff is only required
> to submit evidence that has the capacity to sway the
> outcome of the litigation, and from which a jury could
> fairly conclude that the most likely explanation of the
> accident involves the causal contribution of a product
> defect.

Id.  Quoting 2 Am.L.Prod.3d § 31:26, the court further stated

that:

> "The plaintiff is not required to eliminate with
> certainty all other possible causes of the accident.
> It is sufficient if the evidence reasonably eliminates
> other causes such as the handling or misuse of the
> product by others than the manufacturer, thus
> permitting the fact finder to find that it was more
> probably [sic] than not that the product was
> defective."

Id.

　　　　Steelcase seeks summary judgment contending that

plaintiff has not established a prima facie case inasmuch, it says, as plaintiff may not show any of the three Anderson elements necessary to establish a product defectiveness claim through circumstantial evidence.

Plaintiff has produced testimony from himself and one eye witness, Green, indicating that the chair swiftly moved to its lowest position after he sat in it.  While this testimony, as Steelcase notes, is controverted explicitly by Lockhart as well as implicitly by both Fernatt and Landers, the fact that it is disputed raises questions of witness credibility which are for the trier of fact to resolve.

Regardless of the manner in which the chair descended, the undisputed testimony establishes that plaintiff sat in a chair manufactured by Steelcase and that chair performed in a manner contrary to its intended purpose.  Moreover, the plaintiff has produced an expert opinion that the chair malfunctioned as a result of a defect.  SUSPA's engineer has opined that the failure of the chair may have been related to several different design or structural defects.  Steelcase's own witness acknowledges that prior complaints had been filed by other customers, experiencing similar problems with that particular model of chair.  There is also evidence that other chairs purchased by the Postal Service

20

suffered from the same or similar malfunction.  Construing the
facts in a light most favorable to the plaintiff, there is
evidence from which a reasonable juror could conclude that the
malfunction more likely than not resulted from a defect.[6]

There is no evidence that either the Postal Service or
the plaintiff used the chair for anything other than its intended
purpose.  While Steelcase has produced evidence that the failure
of the chair may have been attributable to normal wear and tear,
that testimony is contradicted by the other two experts.
Construing the evidence in a light most favorable to plaintiff, a
reasonable juror may find that it was more probable than not that
plaintiff's injuries were proximately caused by a malfunction
attributable to a defect in the chair.  The court finds that the
plaintiff has presented sufficient evidence to support a <u>prima
facie</u> showing of strict liability.

In addition to his product defectiveness claim,

_____

[6]Steelcase relies on <u>Beatty v. Ford Motor Company</u>, 547
S.E.2d 803 (W. Va. 2002), which affirmed a grant of summary
judgment to defendant concerning plaintiff's strict liability and
negligence claims arising from a broken drag link on a two year
old van that had been driven over 110,000 miles.  This action is
distinguishable from <u>Beatty</u> inasmuch as this action, unlike
<u>Beatty</u>, involves a product which unquestionably malfunctioned, a
retained expert's opinion that the malfunction was related to a
specific defect, and testimony as to other examples of the same
model chair suffering from a similar malfunction.

plaintiff also asserts a use defectiveness or failure to warn claim.  Steelcase's motion does not address this claim and thus the court declines to address the claim on summary judgment.

> B.   <u>Spoliation.</u>

Steelcase contends that this action should be dismissed as a sanction for the unavailability of the chair which prejudices both its ability to defend the action and also its ability to seek indemnification from SUSPA.  Steelcase asserts that under <u>Silverstri v. General Motors Corp.</u>, 271 F.3d 583 (4th Cir. 2001), the court may impose the sanction of dismissal for spoliation even if the nonmoving party possesses no control over the subject evidence.  Steelcase asks the court to dismiss the action for the plaintiff's alleged breaches of his duty to preserve evidence.

"Spoliation refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."  <u>Silvestri v. General Motors Corp.</u>, 271 F.3d 583, 591 (4th Cir. 2001).  In <u>Silvestri</u>, the Fourth Circuit affirmed that litigants are under a duty to preserve material evidence, defining that duty as follows:

22

> The duty to preserve material evidence arises not only
> during litigation but also extends to that period
> before the litigation when a party reasonably should
> know that the evidence may be relevant to anticipated
> litigation.  If a party cannot fulfill this duty to
> preserve because he does not own or control the
> evidence, he still has an obligation to give the
> opposing party notice of access to the evidence or of
> the possible destruction of the evidence if the party
> anticipates litigation involving that evidence.

Id. This duty does not give rise to an independent cause of
action or an affirmative defense; rather, spoliation is a rule of
evidence arising from the court's inherent power to govern
proceedings before it.  Hodges v. Wal-Mart Stores, Inc., 360 F.3d
446, 450 (4th Cir. 2004); see also Silvestri, 271 F.3d at 590
("[t]he policy underlying this inherent power of the courts is
the need to preserve the integrity of the judicial process in
order to retain confidence that the process works to uncover the
truth.").  As a rule of evidence, spoliation here is governed by
federal law.  Id.  "Application of the rules with respect to the
spoliation of evidence are rules of evidence administered at the
discretion of the trial court."  Cole, 132 F.3d at 1046.

The imposition of a court-ordered sanction as a remedy
for spoliation should "'be molded to serve the prophylactic,
punitive, and remedial rationales underlying the spoliation
doctrine.'"  Silvestri, 271 F.3d at 590 (quoting West v. Goodyear
Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999)).  Dismissal

23

constitutes "the ultimate sanction" for a spoliation infraction.
Silvestri, 271 F.3d at 593.  Typically, dismissal is not
warranted as a sanction absent a finding of bad faith or similar
action; however, dismissal may be warranted even under less
culpable conduct "if the prejudice to the defendant is
extraordinary, denying it the ability to adequately defend its
case."  Id.  The Fourth Circuit has stated that

> to justify the harsh sanction of dismissal, the
> district court must consider both the spoliator's
> conduct and the prejudice caused and be able to
> conclude either (1) that the spoliator's conduct was so
> egregious as to amount to a forfeiture of his claim, or
> (2) that the effect of the spoliator's conduct was so
> prejudicial that it substantially denied the defendant
> the ability to defend the claim.

Id.  "[D]ismissal should be avoided if a lesser sanction will
perform the necessary function."  Id. at 590.

     Undisputedly, the chair is material evidence in this
action.  According to the evidence before the court, the chair,
property of the Postal Service, was pulled from the floor, tagged
and placed in a secured location shortly after the incident.
Although the evidence suggests the inability of certain Postal
Service employees to locate the chair, there is no evidence as to
the date that the chair was disposed.[7]  Moreover, if the chair

_____

     [7]There is no evidence or assertion as to when Steelcase
became aware of plaintiff's intent to litigate this matter.  The

was disposed of by the Postal Service, there is no evidence that the plaintiff participated in, or had knowledge of, such conduct. Thus, there is no evidence that the plaintiff was the spoliator.

Steelcase relies on the efforts of plaintiff's co-worker, Mary Ann Oats, who purportedly secured stickers from her chair and the chair she believed was involved in the incident, as evidence that plaintiff reasonably knew litigation was anticipated and failed to discharge his duty of notifying Steelcase.[8]  Ms. Oats' actions are hardly the unfettered access referenced in Silvestri.  Indeed, Thompson testified that it was against Postal Service rules to dispose of Postal Service property by giving it to employees.  He further testified that

---

evidence concerning the date of disposition of the chair or the manner of any such disposition is negligible.  No hard date or event was provided to the court as to when any such disposal might have occurred.  Lockhart's testimony that it remained in storage for "months or even years" casts doubt on whether the chair was "disposed" prior to the filing of the lawsuit some eighteen months later.  Even assuming notification did not occur until service of the complaint, it is nevertheless unknown whether the chair was still in the control of the Postal Service at the time of service.

[8]According to Knox, the chair referenced in the Postal Service report was believed to be manufactured on July 16, 1996. Steelcase Reply at Ex. A.  Jackson noted that the information from the "label," presumably the sticker provided by Ms. Oats, had a ship date of July 20, 1994 and a received date of December 5, 1995.  Steelcase's Mot. S.J. at Ex. B.  It would appear that one of the sources references the wrong chair.

any inspection request would have to be approved by the legal department.  There is no evidence that plaintiff was ever granted physical evidence.  Even assuming that plaintiff did breach his duty, the evidence before the court does not establish that he acted in bad faith or that his conduct was otherwise so egregious as to warrant the ultimate sanction of dismissal.

Steelcase nevertheless contends that the sanction of dismissal is also warranted because the absence of the chair causes severe prejudice to its defense.  Steelcase asserts that this situation is similar to Silvestri.

Unlike Silvestri, there are multiple witnesses to the incident here.  Moreover, there is lay and expert witness testimony supporting Steelcase's defenses which include its defense that the chair did not and most likely could not malfunction in the precise manner, i.e. sudden drop, claimed by plaintiff.  There is also expert testimony running the gambit of causes for the malfunction including wear and tear.  While admittedly the precise cause of the malfunction may not be established with certainty, it may not be said at this stage that the absence of the chair so substantially prejudices the defense

as to merit dismissal.[9]

Steelcase also argues that the absence of the chair inhibits its ability to pursue the prosecution of its third-party claims against SUSPA.  This argument fails for the reasons stated.  Additionally, spoliation is a rule of evidence premised upon the inherent power of the court to regulate the conduct of parties to a particular action.  Inasmuch as plaintiff may not be said to be a party to the third-party claim, the court lacks power to impose the sanction in that context.

IV.

For the reasons herein, it is accordingly ORDERED that Steelcase's motion for summary judgment against the plaintiff be, and it hereby is, denied.

The Clerk is directed to forward copies of this written opinion to all counsel of record.

DATED: August 4, 2005

John T. Copenhaver, Jr.
United States District Judge

---

[9]Steelcase has not sought the imposition of a lesser sanction.